[No. 2184]

## CHARLES J. GAULT, RESPONDENT, v. JAMES GROSE, APPELLANT.

[155 Pac. 1098]

1. EVIDENCE—AFFIRMATIVE DEFENSE.
   To maintain an affirmative defense it must be established by a preponderance of the evidence.

2. APPEAL AND ERROR—REVIEW—SUFFICIENCY OF EVIDENCE.
   An appellate court is reluctant to disturb the trial court's judgment on the ground that the evidence does not justify it, and will not do so except where there is no substantial evidence to support it.

3. WATERS AND WATERCOURSES—IRRIGATION—LICENSE—EVIDENCE, SUFFICIENCY OF.
   Evidence in an action to enjoin defendant's use of a ditch to conduct water to his ranch, in which defendant claimed an irrevocable license to use the ditch, *held* to justify a judgment for the plaintiff.

APPEAL from Second Judicial District Court, Washoe County; *Cole L. Harwood*, Judge.

Action by Charles J. Gault for an injunction against James Grose. Judgment for plaintiff, motion for new trial denied, and defendant appeals. **Judgment and order affirmed.**

*L. B. Fowler* and *James D. Finch*, for Appellant:

Appellant proved conclusively the existence of an irrevocable license. The use of the ditch was open and

visible, and known to the owners of the property; and respondent is estopped at this time from denying to the appellant the privilege of using the ditch, which would result in reducing the value of the latter's land and make a portion of it absolutely worthless. Equity will not permit acts which are fraudulent and unjust. (*Gustin* v. *Harting*, 121 Pac. 522; *Maple Orchard G. & V. Co.* v. *Marshall*, 75 Pac. 371; Wiel on Water Rights, 3d ed. vol. 1, p. 601, secs. 556, 557.)

*Summerfield & Richards*, for Respondent:

The evidence does not show an irrevocable license, but merely permission to appellant from successive owners of the land to make use of the ditch from time to time, as an accommodation. (*Ewing* v. *Ray*, 62 Pac. 790; Farnum on Waters, vol. 3, p. 2317; 25 Cyc. 646.)

The waters claimed by appellant are waste waters, and the law is well settled that title to waste waters cannot be acquired by appropriation and use thereof. (*Bidleman* v. *Short*, 38 Nev. 467.)

By the Court, COLEMAN, J.:

Respondent obtained a judgment in the district court restraining appellant from using a certain ditch through which to conduct water upon his ranch, and from said judgment this appeal was taken.

The lands owned by both parties consist of three 40-acre tracts, and originally belonged to one Bryant, who sold the southernmost tract to a man named Vance, which was finally acquired by appellant. The other two 40's lying north of the tract owned by appellant were sold by Bryant to one Matthews, and from him passed through several others to respondent. Both appellant and respondent are stockholders in the Orr Extension Ditch Company, which owned a ditch that was operated along the northerly line of respondent's northernmost tract, and, as such stockholder, are entitled to a certain amount of water from said ditch company for irrigation and domestic purposes. Since appellant's land is separated from the

ditch owned by the Orr Extension Ditch Company by two 40-acre tracts, the question of conducting the water from said Orr ditch to appellant's land is one which demanded solution by appellant and his predecessors in interest from the time the land was acquired by Vance. The ditch in question is on the west line of the respondent's ranch, running in a southerly direction.

To the complaint of respondent appellant filed an answer pleading several defenses, but only one of them is relied upon in this court, viz, an irrevocable license to use the ditch in question.

This may be said to be a most unusual case, in that there is no dispute as to the rule of law relied upon by appellant; and, although the testimony consists of about 6,000 words, both parties assert that the evidence is singularly free from conflict; each claiming, however, that the testimony should be construed so as to sustain his contention. It will thus be seen that the only way to arrive at a conclusion as to the disposition which should be made of the case on this appeal is by reading every word of the testimony. This we have done.

Mr. Bryant, the original owner of the land now owned by both parties to this action, prior to selling any of the land, constructed a ditch on the westerly line of the land so owned by him to a point within a short distance of the 40-acre tract now owned by appellant, which he used for the irrigation of the two 40-acre tracts now owned by respondent. Vance having sold the 40-acre tract to one Wills, the latter negotiated with and obtained from Bryant a deed granting a right of way parallel to said ditch for a pipe line to conduct water from the Orr Extension ditch to the land then owned by him, and now owned by appellant.

The chief testimony in behalf of appellant to sustain his contention is as follows:

"Examination of appellant: Q. Well, you did what with the ditch? A. Did what with the ditch?

"Q. Yes. A. Went and cleaned it out for a while, a year or so. The ditch was there, and I went to Mr.

Matthews and I said: 'Mr. Matthews, I want to clean that ditch and get water through that ditch.' I think it is twelve years ago this coming July he told me I could clean the ditch, and I have been cleaning and keep of it in repair from that day to this.

"The Court—Who is Mr. Matthews? A. He is the man that bought the ranch from Mr. Bryant.

"The Court—He owned the ranch at that time? A. He did at that time; yes, sir.

"Mr. Fowler—Q. Mr. Matthews was in possession and was the owner of the land now held by Charles J. Gault; is that correct? A. Yes.

"Q. How long was he the owner and in possession of that land, if you know? A. I think it must be fourteen years ago since he took possession of that.

"Q. How long was he there? A. He was there, I think it is six or seven years.

"Q. And who succeeded him as the owner of the property, if you know? A. Mr. Avansino bought Mr. Matthews out.

"Q. And then who succeeded Mr. Avansino? A. Mr. Capurro.

"Q. Who succeeded Mr. Capurro? A. Mr. Victor.

"Q. Who succeeded Mr. Victor? A. Mr. Gault.

"Q. How long ago did Mr. Avansino enter upon that property? A. Two years ago last February I think was the first I hear of him; two years ago last February since he came on the property. I was in peace and quietness up to that time. We worked together; cleaned the ditch together. Mr. Victor dared me to go in the ditch, and I wanted to know the reason I couldn't go in and do as I had been doing for years previous to that. I says: 'I have been getting water through this ditch, been cleaning it and keeping it up every year for ten years.' I had been doing that before Mr. Victor or any one interfered with me in regard to cleaning the ditch or getting water from it.

"Q. What has been the nature of your use of the disputed ditch in regard to the quantity of water? A.

Why I couldn't irrigate some parts of my land without that ditch.

"Q. Have you used that ditch every year during the time you have been on your property in practically the same way? A. I have cleaned it out, Mr. Fowler.

"Q. You have cleaned that ditch? A. I cleaned that ditch; started to clean the ditch twelve years ago this coming July, but the water was coming down before I cleaned it at all."

On cross-examination he testified:

"Q. Did you ever have a conversation with Mr. Matthews to be permitted to take water through that ditch for the purpose of permitting you to give your stock a drink through the winter? A. Never after we talked at the ditch. My place was dry in the winter time because it couldn't come through that ditch and the water was going in the drain ditch.

"Q. In that conversation did you say to Mr. Matthews that you wanted some water for your cattle during the winter? A. I said during the winter season I had to drive my cattle from the place to water them, and I cleaned the ditch out and put in a box. I took it to the house where the box used to be at Mr. Vance's time. They were rotted out.

"Q. You say the box on your land, the boxes, had rotted out on that ditch during Mr. Vance's time? A. Yes; through the low lands.

"Q. Through the low lands? A. Yes; the lowest spot; it was in my land.

"Q. That conversation that you refer to with yourself and Mr. Matthews you asked Mr. Matthews for permission to take water through that ditch, did you, for winter so you could water your stock, didn't you? A. Winter was never mentioned. I took it through in July month. Is that winter month?

"Q. Did you ask Mr. Matthews then and there to take water through that ditch to water your stock? A. In July month?

"Q. When you had that conversation? A. I told Mr.

Matthews that in the winter time I had no water for my stock, and I could clean that ditch out and get water through it, and he told me I could, and I turned the water in that ditch in July month. Mr. Matthews didn't come and say, 'Stop that water,' nor never did any other man up to the present time, but Mr. Gault and Mr. Victor.

"Q. But you did tell Mr. Matthews at that time that in the winter you had to drive your cattle or stock off the ranch to water them? A. I had no other way.

"Q. Did you tell him that? A. I didn't tell him that I drove my cattle off, but I had to do so.

"Q. For what purpose? A. For to water them.

"Q. What did you ask Mr. Matthews? Why did you ask Mr. Matthews to allow you to take water through that ditch? A. Because I didn't understand about it. I know the ditch was there, and, knowing that Mr. Matthews was supposed to own that ranch above me, I went to him like a man and asked him permission to clean that ditch and get water through it. I didn't want to go in and jump before I knew what I was jumping about.

"Q. You received permission from Mr. Matthews to take water through that ditch? A. I did.

"Q. Did you have any other conversation with Mr. Matthews about taking the water through that ditch? A. Never."

Respondent, to rebut the contention of the appellant, introduced the following, with other testimony:

"Examination of Mr. Matthews: Q. When you went on the ranch was that ditch leading from your ranch to the Grose ranch open or closed? A. It was closed when I went on the ranch.

"Q. How was it closed? A. It was just grown up with weeds, rushes, and the banks fallen in, sort of showing evidence of disuse for a long time.

"Q. At that time was there any water going through your ditch into the lands of Grose? A. No, sir.

"Q. Was the extension of your ditch onto the lands of Grose ever opened in your time? A. Yes.

"Q. Under what circumstances was that extension

opened?   A.  In the fall of 1902 I think Mr. Grose asked permission if he might use the ditch in the winter time to take water down to his premises; I think he said for the purpose of watering his stock in the winter time.

"Q. Now that was Mr. Grose, the defendant in this case?   A. Yes.

"Q. To the best of your recollection, I want you to state all the conversation that then occurred between yourself and Mr. Grose.   A. I don't remember any more than just the request to use the ditch to carry a small amount of water throughout the winter time down to his premises, and that he might take it out of my gate on the Extension ditch.

"Q. Did you give him that permission?   A. I did.

"Q. Did he state at that time what he wanted the water for?   A. I think he did; I think he said it was to water his stock.

"Q. After you gave him that permission, what, if anything, did Mr. Grose do upon his lands in connection with your ditch; I mean immediately after.   A. I don't think he did much of anything.

"Q. Did he have to clear the extension to the ditch? A. He had to clear it out before he could get the water through.

"Q. Do you mean to say that the extension of that ditch had to be cleaned out before water would flow into it?   A. That is what I understand; yes.

"Q. Had reeds grown up and grasses?   A. Yes.

"Q. Upon your land or near thereto had your ditch been blocked up or backed up before you gave that permission?   A. I cannot remember whether it was; whether there was any dam put in there or not.   The water didn't seem to have any tendency to flow that way; so I don't think there was any necessity for a dam.

"Q. But from your recollection the extension of that ditch had to be cleaned out before water could flow through; is that right?   A. It did; yes.

"Q. Did Mr. Grose obtain this permission in 1903?   A. I am pretty sure that was the year.

"Q. You bought the place in 1898, didn't you?   A. 1898.

"Q. During the period from 1898 to the time you gave this permission, in 1902 or 1903, was Mr. Grose irrigating his lands from any extension of your ditch?  A. No, sir.

"Q. Are you positive of that?  A. I am.

"Q. And during that same period was Mr. Grose irrigating his low lands, or what have been designated as the lands on the north of his ranch?  A. I cannot remember what he was doing down there in those years, those first years.

"Q. But you do remember he was not irrigating that portion of his ranch from water obtained from your ditch?  A. Yes.

"Q. Now, Mr. Matthews, is that the only permission that you gave Mr. Grose, or did he ever ask you any further permission?  A. He did.

"Q. How long after the first permission?  A. As I remember, every fall he would come to me—he or George Grose would come to me—and ask if I was through irrigating with that ditch, so he might have the use of it in the winter time for some purpose.  *  *  *

"Q. After this first conversation, Mr. Matthews, to which you have testified, did you ever have any further conversation with Mr. Grose regarding the taking of water through the extreme south end of your ditch?  A. Only I think in the fall of the year, as the fall came around.

"Q. What is your recollection of that conversation or those conversations; what did they consist of?  A. Generally as an arrangement by which he could take and use the ditch in the winter time for running a small amount of water down to his place.

"Q. How many times did such conversations occur, if you can remember?  A. I think about four times.

"Q. Extending over what approximate period?  A. About from 1902, I think, in the fall of 1905, including both years.

"Q. Now, Mr. Matthews, after you allowed him to take the water through that ditch pursuant to the conversations testified to by you, when did he start to irrigate with that water, if you know?  A. There was one circumstance I have forgotten, that George Grose came to

me and asked me once for permission to irrigate—I think that was in 1903—to use the ditch for about a week to irrigate some land; that was right after the ditch was cleaned and before I was ready to use the ditch. He asked me for permission to use the ditch about a week.

"Q. George Grose asked that?   A. Yes; George Grose.

"Q. That would be approximately in the year 1902 or 1903?   A. 1902 or 1903; I think 1903.

"Q. Did you give him that permission?   A. I did.

"Q. Now, during the time that you held possession of the Gault ranch were you deprived of any water from your ditch on account of the occupants of the Grose premises using that water for stock or for other purposes? A. No, sir; I was not; I don't think so.

"Q. You didn't suffer from any of their operations in regard to the use of that water, did you?   A. Some small overflows happened once in the winter time.   The ditch filled with snow, and the water spread over considerable land.

"Q. I am not referring to that particularly, but I mean to say after these conversations that you had, had they taken the water and used it for stock, irrigation, or whatever purposes they may have used it for?   On account of their use of that water was your supply diminished to the extent that you could not properly irrigate your lands?   A. I think not, because they never used it for irrigating unless it was times when I was not using the ditch; at times when I happened to lay the ditch aside, my ground would be all wet, they would come up and turn the water down their way."

**1-3.** To maintain an affirmative defense it must be established by a preponderance of the evidence.   An appellate court is reluctant to disturb the judgment of a trial court on the ground that the evidence does not justify the judgment, and will not do so except where there is no substantial evidence to support it.   In the case at bar we think, from a reading of the entire record, that the trial court was amply justified in rendering the judgment which it did.   The appellant alone testifies as to

the granting to him of the so-called license; and the testimony of the witness Matthews, from whom appellant claims to have acquired it, who was called by respondent, shows clearly that there was no intention on his part to grant such a license. Before it can be said that such a license was granted, as contended for by appellant, there must have been a mutual understanding to that effect. Taking the testimony of Matthews at its face value, that there was no such meeting of the minds is clear.

Unless the trial judge entirely disregarded the evidence of respondent, we do not see how he could have rendered a judgment in favor of the appellant. The trial court evidently was of the opinion that the evidence in behalf of respondent was convincing. We cannot say that the court was not justified in its conclusion.

We are of the opinion that the judgment and order appealed from should be affirmed; and it is so ordered.

NORCROSS, C. J.: I concur.

MCCARRAN, J., having been counsel for one of the contending parties before becoming a member of this court, did not participate in the consideration of the case.

### ON PETITION FOR REHEARING
*Per Curiam:*

Petition for rehearing denied.